STATE OF VERMONT

SUPERIOR COURT ENVIRONMENTAL DIVISION
Docket No. 29-3-16 Vtec

| | |
|---|---|
| Korrow Real Estate, LLC Act 250 Permit Amendment Application (Appeal from Act 250 Permit No. 5W1559) | **Merits Decision** |

This is an appeal by Korrow Real Estate, LLC ("Korrow") from a District Commission decision granting Korrow a state land use ("Act 250") permit. The Court held a trial on March 9–10, 2017, at the Washington County Civil Division, and at the close of trial ruled from the bench in favor of Korrow. The Court originally intended to issue a written judgment order after the trial pursuant to V.R.C.P. 58. Upon reflection, for clarity for the parties and practice before the Environmental Division generally, we repeat and elaborate on our decision here in writing.

Korrow owns properties off Vermont Route 12A in the Town of Northfield ("Town"), on either side of Stony Brook Road. On the northerly side of Stony Brook Road is an improved parcel of land that hosts offices for Gillespie Fuels and Propane ("Gillespie"), a business that is related to Korrow. On the southerly side of Stony Brook Road is a parcel that Korrow recently improved with a large (100 feet by 80 feet) barn to be used to park Gillespie trucks. Korrow brought dry pack onto the property after the barn was constructed to level the parking area inside the barn. Korrow also brought a small amount of earthen fill, about sixty cubic yards, to level off areas on either side of the areas outside the barn. Korrow received a municipal zoning permit prior to building the barn and bringing in the fill.

These improvements would not have resulted in the legal actions presented to this Court, except for the fact that Korrow constructed the improvements without first obtaining an Act 250 permit. As a consequence, the Vermont Natural Resources Board ("NRB") prosecuted an Administrative Order against Korrow. See NRB v. Korrow Real Estate, LLC, No. 11-1-14 Vtec. The parties stipulated to a resolution of that case by signing an Administrative Order of Determination, which was approved by this Court. See NRB v. Korrow Real Estate, LLC, No. 11-1-14 Vtec, slip op. at 1 (Vt. Super. Ct. Env. Div. Jan. 27, 2014) (Walsh, J.). The parties' stipulation

and the Court's Order called for Korrow to pay fines totaling $5,784.60 and to seek and receive an Act 250 permit for the completed barn and fill.

Korrow thereafter filed an Act 250 permit application for the completed improvements. On February 12, 2016, the District 5 Environmental Commission ("District Commission") issued an Act 250 permit, albeit with several conditions. In particular, the District Commission directed that the existing barn structure and associated fill that Korrow had brought onto the site be removed to an area beyond the Fluvial Erosion Hazard Area ("FEH") zone depicted by officials from the Vermont Agency of Natural Resources ("ANR"). The Act 250 permit authorized Korrow to reconstruct or replace the barn outside of the FEH zone. In response to this District Commission decision, Korrow filed the above captioned appeal with this Court.

The parties engaged in extensive settlement discussions, but those efforts did not result in a resolution of this appeal. By the time a trial was scheduled, only three of Korrow's six questions remained from its original Statement of Questions: Questions 4, 5, and 6. During trial, Korrow advised that Question 4 had become moot and did not need to be adjudicated by the Court. The Court therefore focused its analysis on the legal issues raised by Questions 5 and 6, which asked whether "the Act 250 Floodway or the Fluvial Erosion Hazard Area zone is incorrectly designated at the project site [Question 5; and w]hether the as-built project complies with [Act 250] Criteria 1(D)-Floodways; 1(F)-Shorelines; and 10-Local and Regional Plans [Question 6]."[1] *Appellants Statement of Questions, filed April 13, 2016, at Pp. 1–2.*

While the legal issues had been considerably reduced by the time of trial, the detailed testimony necessary to address those two legal issues required two days of trial, conducted on March 9–10, 2017. At the close of the evidence, the Court took a recess to review its trial notes, conduct some legal research, and deliberate. Thereafter, the Court determined that it could render its Findings of Fact and Conclusions of Law on the record of the last day of trial. This Merits Decision is intended to provide a summary of the Court's Findings and a further explanation of its Legal Conclusions.

---

[1] Conformance with Act 250 Criterion 10 was only denied by the District Commission because of its determination that the as-built project did not conform to Criteria 1(D) and (F). Thus, conformance with Criteria 1(D) and (F) presented the only remaining legal issues by the close of evidence at trial.

Upon reconvening the hearing, the Court first thanked the parties and their legal counsel for their preparation and professionalism. Korrow was represented by L. Brooke Dingledine, Esq; ANR and the NRB were represented by Assistant Attorney General Melanie McNeill Kehne, Esq., with assistance from Elizabeth F. Lord, Esq. of ANR and Peter J. Gill, Esq. of the NRB.

At the close of trial, the Court noted that the undisputed facts showed that the initial failure to obtain an Act 250 permit was more the consequence of neglect than a malicious act: the Korrows relied upon the opinion of the Town of Northfield Zoning Administrator that an Act 250 permit was not required for this project. The neglect was two-fold: first, that of the Zoning Administrator, who gave faulty advice, and second that of the Korrow officials, who relied upon that faulty advice, particularly in light of the fact that the zoning permit issued by the Administrator specifically directed that state permits may be required and provided contact information for state officials who could make a state permit jurisdictional determination. The Korrow officials chose to not contact the state officials for a jurisdictional determination at that time.

Whether Korrow's reliance on the Zoning Administrator was understandable or not, the Court determined that such reliance and resulting construction without a permit was not germane to the legal questions presented. The Court expressed before and after the taking of evidence that the fact that the barn was built before Korrow's Act 250 application was filed would not impact the Court's determinations of whether the project conformed with Criteria 1(D) and (F). At trial, the Korrows asserted that the barn and associated fill were in conformance with Act 250 Criteria 1(D), 1(F) (and Criterion 10 insofar as it incorporates compliance with 1(D) and 1(F)). Those were the sole issues that the Court addressed at trial and will address here.

Act 250 Criterion 1(D), which deals with "floodways," requires an applicant to demonstrate that:

> (i) the development . . . of lands within a floodway will not restrict or divert the flow of flood waters, and endanger the health, safety and welfare of the public or of riparian owners during flooding; and

> (ii) the development . . . of lands within a floodway fringe will not significantly increase the peak discharge of the river or stream within or downstream from the area of development and endanger the health, safety, or welfare of the public or riparian owners during flooding.

3

10 V.S.A. §§ 6086(a)(1)(D).

Criterion 1(F), which deals with "shorelines," requires an applicant to demonstrate that:

the development . . . of shorelines must of necessity be located on a shoreline in order to fulfill the purpose of the development . . . , and the development . . . will, insofar as possible and reasonable in light of its purpose:

(i) retain the shoreline and the waters in their natural condition;

(ii) allow continued access to the waters and the recreational opportunities provided by the waters;

(iii) retain or provide vegetation which will screen the development or subdivision from the waters; and

(iv) stabilize the bank from erosion, as necessary, with vegetation cover.

10 V.S.A. §§ 6086(a)(1)(F).

The common factual determination made relevant by these two Criteria concerns the limits of the "floodway" and resulting "shoreline." The parties presented similar determinations of the location of both the "flood plain" and the "floodway." See Korrow Exhibit 6, depicting the area surrounding the Korrow site that has been designated by ANR officials as the "Floodway."

This ANR site map depicts the area of the new Korrow building as being outside the floodway.[2]

Sacha Pealer, a floodplain manager in ANR's rivers program, and Rob Townsend, a licensed engineer who testified on behalf of Korrow, also testified at trial to a broader area that depicts the FEH zone. See Exhibit 4, Appendix F, page 4. The term "FEH zone" is not referenced in either the applicable provisions of 10 V.S.A. § 6086(a)(1) or the Act 250 Rules. Rather, ANR has established a practice of including within its definition of the statutory terms "floodway" and "floodway fringe," referenced above in 10 V.S.A. §§ 6086(a)(1)(D)(i) and (ii), both the designated floodway and the FEH zone. The FEH zone determined by ANR near the Korrow property is depicted on ANR Exhibit B. Portions of the Korrow barn and fill are located within the FEH zone depicted on ANR Exhibit B.

---

[2] Exhibit 6 shows the Korrow buildings, outlined with blue lines. These building depictions were added to the ANR Floodway map by Korrow's engineer, and the engineer then used the overlaid floodway map as a supporting document for the Korrow's Act 250 Application, a copy of which was admitted at trial as Exhibit 4. See Appendix F to Exhibit 4 for several site maps, some of which depict floodway details for this area.

The FEH zone may be interchangeable with the term "river corridor," which, like the term FEH zone, is not specifically referenced in either the applicable statutes or Rules, but is referenced in certain guidance documents ANR publishes and makes available to applicants and the general public.[3] This Court understands that ANR, as the state agency that specializes in the protection of our public waters, including rivers and streams, has the authority to interpret applicable statutory provisions. We further understand that such determinations are entitled to deference. See In re N. E. Materials Grp. LLC Act 250 JO # 5-21, 2015 VT 79, ¶ 21, 199 Vt. 577 (directing that courts should give "deference to [a state environmental agency's] interpretation of legislation within its area of expertise" (citing In re F–35A Case, 2015 VT 41, ¶ 16 n. 3, 198 Vt. 510); see also In re Green Crow Corp., 2007 VT 137, ¶ 12, 183 Vt. 33 (explaining that this Court gives deference to the former Environmental Board's interpretation of Act 250) (quotation omitted)).

The Green Crow Corp. opinion is particularly illustrative for the legal issue presented here. Green Crow directs that the level of discretion shown to agency decisions within their areas of expertise may differ:

> We recognize, of course, that the line between jurisdictional and nonjurisdictional questions may not always be clear. See, e.g., C. Sunstein, *Law and Administration After Chevron*, 90 Colum. L.Rev. 2071, 2099 (1990) (noting the "sometimes elusive distinction between jurisdictional and nonjurisdictional questions"). The Board's ruling [in Green Crow] was jurisdictional in the sense that it delineated the Board's power to regulate a certain type of activity, but nonjurisdictional in that it did not expand the class of cases the Board could rule on in the first instance. The level of deference we afford to agency determinations that are arguably jurisdictional depends on the character of the decision; fact-intensive determinations that rely on agency expertise will generally be given more deference than purely legal determinations.

2007 VT 137, ¶ 13.

With these standards in mind, we conclude that the ANR determinations of what constitutes the floodway or floodway fringe in the case at bar constitute "fact-intensive determinations that rely on [the] expertise" of the ANR official who testified at trial, and are therefore entitled to a greater degree of deference. But the question remains: how unwavering

---

[3] See ANR Exhibit D, entitled "Technical Guidance for Determining Floodway Limits" and ANR Exhibit E, entitled "River Corridor Protection Guide; Fluvial Geomorphic-Based Methodology (Nov. 2008)."

must our deference be and can the deference shown be unassailable?  For the resolution of this legal issue, we look to the United States Supreme Court opinion in <u>Chevron</u>, which is widely regarded as the seminal opinion on how to assess the deference that should be shown to administrative agencies and their determinations.  Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

<u>Chevron</u> first notes that a reviewing court is obligated to follow clear and direct legislative language on "the precise question at issue.  If the intent of Congress is clear, that is the end of the matter. . . ."  <u>Chevron</u>, 467 U.S. at 842.

If, however, the applicable statutory language is less than precisely clear, <u>Chevron</u> directs a two-step analysis.[4]  First, the reviewing court is directed to determine whether the legislature provided an interpretation or definition for the statutory language at issue in the statute itself; if so, then the reviewing court need not look to the agency interpretation.  <u>Chevron</u>, 467 U.S. at 843–844.  If, however, the legislature did <u>not</u> provide guidance on how a statutory provision is to be interpreted, then the reviewing court is directed to review the interpretation offered by the agency and decide whether it is "reasonable."  <u>Id</u>.

In the appeal before us, the operative statutory terms do have statutory definitions, although we believe that those definitions leave some areas that require further interpretation.[5]  The enabling provisions in title 10, chapter 151 provides the NRB with the authority to "adopt substantive rules . . . that interpret and carry out the provisions of" chapter 151.  10 V.S.A.

---

[4] Other U. S. Supreme Court precedent appears to direct a preliminary analysis prior to the two-step process outlined in <u>Chevron</u>, that being an initial determination of whether the agency asserting how a statute should be interpreted followed proper administrative procedures in issuing its interpretation of the law.  If not, the interpretation by the agency should only be afforded the "respect proportional to its power to persuade."  <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235 (2001), *citing* <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).

[5] "Floodway" is defined as "the channel of a watercourse which is expected to flood on an average of at least once every 100 years and the adjacent land areas which are required to carry and discharge the flood of the watercourse, as determined by the Secretary of Natural Resources with full consideration given to upstream impoundments and flood control projects."  10 V.S.A. § 6001(6).

"Floodway fringe," which is a term also used in Criterion 1(D), (codified in 10 V.S.A. § 6086(a)(1)(D)), is defined as "an area which is outside a floodway and is flooded with an average frequency of once or more in each 100 years as determined by the Secretary of Natural Resources with full consideration given to upstream impoundments and flood control projects."  10 V.S.A. § 6001(7).

"Shoreline" is defined as "the land adjacent to the waters of lakes, ponds, reservoirs, and rivers. Shorelines shall include the land between the mean high water mark and the mean low water mark of such surface waters.  10 V.S.A. § 6001(17).

§ 6025(b).  The NRB is also authorized to seek the cooperation of "other departments and agencies of State government" in fulfilling these administrative responsibilities.  10 V.S.A. § 6024.  Thus, we conclude that the circumstances before us fulfill the first step of the analysis suggested in Chevron: while the legislature provided some insight into the meaning of the statutory language, further interpretative assistance is required by the implementing agency.

With that determination in mind, we move to the next Chevron step: whether the interpretations suggested here by ANR of how to interpret the statutory terms "floodway," "floodway fringe," and "shoreline" are reasonable.  For the reasons stated on the record of the March 10, 2017 trial, as well as the summary below, we conclude that the interpretations propounded by the state, relating solely to the specific floodway areas adjacent to the Korrow property, are not reasonable.

First, we find it initially difficult to define a term—floodway—more broadly than the statute directs and that ANR uses in its own floodway maps.  But because of the remaining uncertainty of all that may be included within the statutory definition of floodway, we look to ANR, with its expertise concerning rivers and their flood areas, for a full appreciation of the term.

Ms. Pealer provided credible testimony and other evidence at trial for the need to consider the meandering nature of rivers.  The FEH zones are estimates by ANR officials, not so much to address flooding which regularly occurs in our State, but to estimate the areas in which a river may move.  See ANR Exhibit E at Pp. 3–20 (discussing "Meander Centerlines," "River Corridors," and "Meander Belt Widths based upon Stream Sensitivity").

The Court understood and accepted the concepts espoused by Ms. Pealer in regards to meandering rivers and the need to consider a reasonable width of an FEH zone, including when the width of the zone is calculated based upon an assessment of a stream's sensitivity to meandering.  Ms. Pealer credibly assessed the sensitivity of the nearby streams, the Dog River and Stony Brook, particularly where Stony Brook flows into a delta with the Dog River south of the Korrow property.  See Korrow Exhibit 6.

However, ANR's proposed limits of the FEH zone, particularly as it abuts and flows onto the Korrow property, does not appear reasonable to the Court, particularly for the following calculations and facts.

7

First, ANR's stream sensitivity assessment indicates that the applicable portion of the Dog River and Stony Brook require a delineation of three channel widths along either side of the meander centerline (i.e.: six channel widths total, prior to taking into consideration the restrictive nature of Vermont Route 12A). The undisputed evidence at trial was that the applicable channel width was 52 feet; a zone covering three times that width would reach no more than 156 feet from the meander center line. ANR, however, depicts an FEH zone extending 248 feet from the left bank of the Dog River towards the barn, which is nearly 100 feet wider than their own formula would call for. See ANR Exhibit B. While a part of the Korrow barn is within 248 feet of the Dog River, no part of the barn or fill is within 156 feet of the river.

Second, the undisputed testimony at trial, put into context for the Court by the site visit that was conducted prior to trial, was that a significant upward slope exists as the land rises beyond a relatively flat area beside the River and then up on the Korrow property. This upward slope was not created by the Korrow's placement of fill on either side of the barn. ANR's delineation of the FEH zone appeared to disregard this natural lay of the adjacent lands.

Lastly, witnesses at trial, none of whom the State contradicted, spoke to the historical significance of the Korrow barn parcel. No resident who testified, including two who have lived in the area for fifty or more years, could recall the Korrow parcel as having flooded in the multiple floods that have ravaged this area, particularly Route 12A, including the most recent destruction of this and other areas by Tropical Storm Irene in 2011. In fact, the historical significance of the Korrow parcel has been that it is where residents have parked their vehicles and congregated to witness flooding events, without the fear of being washed away.

For all these reasons, and under these specific circumstances, we decline to adopt the delineation of the "floodway," "floodway fringe," and the "shoreline" propounded by ANR, as those terms are used in 10 V.S.A. §§ 6086(a)(1)(D) and (F). Rather, we conclude that the credible evidence at trial convinced us that the applicable floodway, floodway fringe and shoreline limits are not impacted by the barn or the fill that was brought onto the property. Further, due to the manner in which the barn was constructed and the fill was deposited, this development will not "restrict or divert the flow of flood waters and endanger the health, safety or welfare of the public or riparian owners during flooding," and will (i) allow the shoreline to be retained, "(ii)

8

allow continued access to the waters . . . (iii) retain or provide vegetation which will screen the development . . .; and (iv) stabilize the bank from erosion, as necessary, with vegetation cover." Id.

We therefore conclude that the barn and fill, as currently developed, conform with Act 250 Criteria 1(D) and 1(F). Since non-conformance with those criteria was the only basis offered by the District Commission in its determination of non-compliance with Act 250 Criterion 10, we **REVERSE** and **VACATE** those determinations, and also conclude that the project as developed conforms to Act 250 Criterion 10.

We hereby **REMAND** these proceedings to the District 5 Environmental Commission, solely to complete the ministerial act of reissuing Act 250 Permit No. 5W1559 in conformance with our determinations, including the removal of all conditions and references to the proposal to remove the as-built barn and associated fill.

A Judgment Order accompanies this Merits Decision. This completes the current proceedings before this Court concerning this application.

Electronically signed on March 23, 2017 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division